COMMONWEALTH *vs.* JAMES N. McHOUL, JR.

Suffolk. March 6, 1967. — May 16, 1967.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Insanity. Evidence,* Distortion of evidence. *Practice, Criminal,* Exceptions: whether error harmful; Requests, rulings and instructions; Charge to jury. *Error,* Whether error harmful. *Words,* "Appreciate," "Know," "Irresistible."

At the trial of an indictment in which a qualified medical expert for the Commonwealth testified that his opinion as to the sanity of the defendant was that "according to the M'Naghten rule he was legally sane," it was prejudicial error for the judge to strike out the part of the statement "about the M'Naghten rule" and to allow the "last part" to stand. [545–546]

Failure of the defendant to take exception to the trial judge's charge as given at the trial of an indictment in which the defence of insanity was in issue did not preclude this court from appraising the charge to ascertain whether it complied with requests by the defendant in effect that the judge state at least the Massachusetts rule on criminal responsibility in its accepted wording. [547]

At the trial of an indictment in which the defence of insanity was in issue, an instruction by the judge that in order to establish that defence the defendant must be shown to have been unable to distinguish between

right and wrong, and that irresistible impulse was no defence unless it was accompanied by such inability, was wrong even if the evidence did not show conduct that was irresistibly impelled.   [547–548]

Discussion of the American Law Institute's Model Penal Code, Proposed Official Draft (1962), Section 4.01, relating to criminal irresponsibility by reason of mental disease or defect.   [548–555]

The rule stated in the American Law Institute's Model Penal Code, Proposed Official Draft (1962), Section 4.01, as to when mental disease or defect excludes criminal responsibility is a restatement of the Massachusetts rule on that subject in modern terms and in clearer and more understandable words, and hereafter in criminal cases in which the defence of insanity is in issue the trial shall be conducted and the charge given in accordance with the Code rule.   [548, 555]

INDICTMENTS found and returned on April 6, 1966.

The cases were tried in the Superior Court before *Tomasello, J.*

*William P. Homans, Jr.* (*Ronald J. Chisholm, Steven J. Comen & Grover G. Jackson* with him) for the defendant.

*John A. Pino,* Assistant District Attorney (*James M. Kickham,* Legal Assistant to the District Attorney, with him), for the Commonwealth.

WHITTEMORE, J.   The issues on this appeal under the provisions of G. L. c. 278, §§ 33A–33G, as amended, relate to the defence of insanity.   The defendant, McHoul, was convicted and sentenced for two crimes committed about 2 P.M. on March 29, 1966 — assault with intent to rape, and breaking and entering a dwelling house with intent to commit rape.   The defendant at the time was a patient at Boston State Hospital.   About 2:25 P.M. on March 29, the defendant said to a male practical nurse at the hospital, who asked where his trousers were, "I want to tell you something.  I did something wrong.  I raped a woman."   Counsel who argued the case on appeal did not represent the defendant at the trial.

1.   An expert for the Commonwealth, Dr. Malcolm Rosenblatt, testified that he had an opinion as to the sanity of the defendant which was, "That according to the M'Naghten rule[1] he was legally sane."   The defendant moved to

---

[1] "[T]he rule (which prevails in England and in the majority of States in this country) . . . laid down in the celebrated *M'Naghten's Case* in 1843. 10 Cl. & Fin. 200" and which is embraced in our "considerably broader" rule.  *Commonwealth* v. *Chester,* 337 Mass. 702, 711.

have the answer struck. The judge ruled, "I will strike out the part about the M'Naghten rule. I will allow the last part to stand." The defendant excepted "to the part of the answer the Court did not strike."

The rule which has prevailed in this Commonwealth was first expressed by Shaw, C.J., in *Commonwealth* v. *Rogers,* 7 Met. 500, 501–502. A more recent statement, including a quotation from the *Rogers* case, is in *Commonwealth* v. *McCann,* 325 Mass. 510, 515: "One whose mental condition is such that he cannot distinguish between right and wrong is not responsible for his conduct, and neither is one who has the capacity to discriminate between right and wrong but whose mind is in such a diseased condition that his reason, conscience and judgment are overwhelmed by the disease and render him incapable of resisting and controlling an impulse which leads to the commission of a homicide. In such an instance, the homicide would be 'not the act of a voluntary agent, but the involuntary act of the body, without the concurrence of a mind directing it.' "[2]

In the light of this rule, the judge's action in respect of Dr. Rosenblatt's answer was prejudicially erroneous. The witness did not testify that in his view, McHoul, according to Massachusetts law, was sane. It is beside the point whether he would have. He did not testify in respect of irresistible impulse. The judge's ruling left before the jury a statement, attributable to a qualified physician, not in fact made by him. It presented to the jury, in terms conclusive of the issue that they alone were to pass on, an unsupported statement.

2. The defendant excepted to the refusal of the judge to charge in the words of § 4.01 of the American Law Institute's Model Penal Code, Proposed Official Draft (1962) p. 66: "Section 4.01 Mental Disease or Defect Excluding Responsibility. (1) A person is not responsible for crimi-

---

[2] The importance of Chief Justice Shaw's modification of the M'Naghten rule to add the test of irresistible impulse is universally recognized. From it stems the second part of the rule stated in the American Law Institute's Model Penal Code. See text, point 2 below.

nal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.''

For the reasons stated below (point 2 [b]), we regard the Code definition as an evolutionary restatement of our rule rather than a substantively new rule, which, of course, it is in those jurisdictions that adopt its dual test to replace the single cognitive test of the M'Naghten rule. The requests in the language of § 4.01 were fully adequate to direct attention to the dual test of criminal responsibility as it has been stated in our cases. In the light of those cases an instruction in Model Penal Code terms was not required, and a correct instruction would have been in some such words as are quoted in point 1, *supra,* from the *McCann* case. The instruction given was not, however, in words or substance, our dual test. That no exception was taken to the charge as given does not exclude our appraisal of it as not meeting the implicit requirement of the defendant's requests at least to state our rule in its accepted wording. Furthermore, the error is related to the error discussed in point 1 for which there must be in any event a reversal. We do not decide whether in other circumstances we would be warranted in reviewing the charge. See *Commonwealth* v. *Conroy,* 333 Mass. 751, 757. We look first at the definition of insanity as stated by the judge to the jury.

(a) The judge charged the jury substantially in terms of the M'Naghten rule, saying, '' [E]very man is presumed to be sane . . . until the contrary be proved to your satisfaction. To establish a defense upon the ground of insanity, it must be clearly proved that at the time of the committing of the act the party accused was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or if he did . . . [know], that he did not know he was doing what was wrong. The knowledge required by the 'right and wrong' test is the capacity to distinguish between right and wrong; not in the abstract, but as to the particular act which constituted

the crime charged. If such capacity existed at the time of the forbidden act, the accused is fully responsible though in other respects he may have been insane. If such capacity did not exist at the time, the accused is then not responsible.'' He then added, ''An irresistible impulse to commit a crime in and of itself is no defense to its commission unless it is accompanied by an inability to distinguish between right and wrong and . . . [a lack of] awareness of the nature and quality of the acts committed at the time of their commission.''

This instruction wrongly stated that the absence of awareness of wrongdoing must accompany irresistible impulse. We reject the Commonwealth's suggestion that the defect in the charge may be overlooked because the evidence did not show conduct that was irresistibly impelled. The ''burden of proof is on the Commonwealth to prove the defendant mentally responsible for crime (*Commonwealth* v. *Johnson,* 188 Mass. 382, 388).'' *Commonwealth* v. *Clark,* 292 Mass. 409, 415. Hence the issue was for the jury under proper instructions. See *Commonwealth* v. *Soaris,* 275 Mass. 291, 298, 301–302.

We do not pause to consider the defendant's contention that the charge also erred in shifting from the Commonwealth the burden of establishing guilt beyond a reasonable doubt. See *Commonwealth* v. *Johnson,* 188 Mass. 382, 388; *Commonwealth* v. *Hartford,* 346 Mass. 482, 489–490; *Davis* v. *United States,* 160 U. S. 469, 481–483; Weihofen, Mental Disorder as a Criminal Defense, c. V.

(b) There has been widespread agreement on the need for a restatement in modern terms of the dual definition of criminal irresponsibility. For reasons to be stated we believe the Model Penal Code has met this need and has done so in language which will not make the dual test in this jurisdiction a substantially different rule in practice.

In *Commonwealth* v. *Chester,* 337 Mass. 702, 713, we said, ''We do not labor under the illusion that the rule of *Commonwealth* v. *Rogers* is entirely satisfactory. Indeed, in this troublesome field there will be serious difficulties in any

rule that can be formulated. . . . We, of course, intend no intimation that the rule tentatively proposed [now finally] by the American Law Institute in its Model Penal Code and which has been recommended favorably by a majority of the Judicial Council[3] . . . is not a desirable one, but no question touching that rule is before us.''[4]

In *Commonwealth* v. *Hartford,* 346 Mass. 482, 491, we rejected the rule of *United States* v. *Currens,* 290 F. 2d 751 (3d Cir.). That, however, was not a disapproval of the Code definition, for the *Currens* case, although accepting in substance the second part of the rule, rejected the cognitive element. See fn. 3.

Advantages of the Code definition are stated in the opinion in *United States* v. *Freeman,* 357 F. 2d 606, 620–621 (2d Cir.), which was approved by four judges of the circuit

---

[3] The Code definition has been adopted or approved, in whole or in part, in several jurisdictions by judicial decision. *United States* v. *Freeman,* 357 F. 2d 606, 622 (2d Cir.). *United States* v. *Currens,* 290 F. 2d 751, 775 (3d Cir.) (cognitive elements [M'Naghten] omitted). *Dusky* v. *United States,* 295 F. 2d 743, 759 (8th Cir.), cert. den. 368 U. S. 998. *Feguer* v. *United States,* 302 F. 2d 214, 244–245 (8th Cir.), cert. den. 371 U. S. 872. *Pope* v. *United States,* 372 F. 2d 710, 736 (8th Cir.). *Wion* v. *United States,* 325 F. 2d 420, 430 (10th Cir.), cert. den. 377 U. S. 946. *Frigillana* v. *United States,* 307 F. 2d 665, 670, fn. 8 (Ct. App. D. C.) (favorable comment). *Terry* v. *Commonwealth* (Ky.), 371 S. W. 2d 862, 864–865. *State* v. *Shoffner,* 31 Wis. 2d 412, 427–428 (by this decision the defendant in Wisconsin is given a choice between the M'Naghten and Model Penal Code tests but, if he chooses the Code test, he must assume the burden of proof). Elsewhere the Code definition has been adopted by statute (with modifications in three instances). Ill. Ann. Stat. c. 38, § 6–2. Md. Ann. Code, art. 59, § 9 (a) as amended by House Bill No. 15, approved May 4, 1967. Mo. Stat. Ann. c. 552, § 552.030 (omits ''substantial capacity'' qualification). N. Y. Rev. Penal Law § 30.05 (''lacks substantial capacity to know or appreciate either: (a) The nature and consequence of such conduct; or (b) That such conduct was wrong''). Laws of Montana 1967, c. 196, § 95–501. Vt. Sts. Ann. Title 13, c. 157, § 4801 (substitutes ''adequate capacity'' for ''substantial capacity''). We are informed that the Code definition has been proposed for adoption or is under consideration in a number of jurisdictions. It has been judicially rejected in three. *State* v. *Lucas,* 30 N. J. 37, 68–72. *State* v. *Poulson,* 14 Utah 2d 213, 216, cert. den. sub nom. *Poulson* v. *Utah,* 375 U. S. 898. *State* v. *White,* 60 Wash. 2d 551, 578–593, cert. den. sub nom. *White* v. *Washington,* 375 U. S. 883. See text of this opinion, *post.*

[4] In the *Chester* opinion, this court rejected the so called *Durham* case rule, or ''product'' test (*Durham* v. *United States,* 214 F. 2d 862 [Ct. App. D. C.]) because it leaves the jury with virtually no standard of responsibility. The *Durham* rule follows that of New Hampshire (*State* v. *Pike,* 49 N. H. 399; *State* v. *Jones,* 50 N. H. 369) and has been adopted by statute in Maine, Rev. Stat. Ann. Title 15, § 102. It has been rejected in many jurisdictions. See, for a summary list, *State* v. *Lucas,* 30 N. J. 37, 69–72.

in addition to the three who were sitting. It reversed a conviction following a trial in which the M'Naghten rule had been applied, and adopted the Code definition.[5]

Perhaps the single greatest point made for the Code definition is that under it, experts will be unrestricted in stating all that is relevant to the defendant's mental illness. This advantage, however, already exists under our rule, properly applied. We indicated in *Commonwealth* v. *Harrison*, 342 Mass. 279, 296–297, that the rule of the *Rogers* case is to be applied to the admission of expert testimony "in terms of modern psychiatric concepts" so as to avoid the "confusion which may result from references to differences between legal insanity and mental illness." This means that experts experienced in the study and treatment of the mentally ill may testify fully as to the nature and extent of impairment of defendants' mental faculties as well as their observations or other bases for their conclusions.[6] See, for cases where evidence appears to have been

---

[5] The opinion in the *Freeman* case notes that nine years of research, exploration, and consideration by the reporters and an advisory committee of judges, lawyers, psychiatrists, and penologists underlay the Code restatement. The Code formulation, the opinion said, "views the mind as a unified entity and recognizes that mental disease or defect may impair its functioning in numerous ways. The rule, moreover, reflects awareness that from the perspective of psychiatry absolutes are ephemeral and gradations are inevitable. By employing the telling word 'substantial' . . . the rule emphasizes that 'any' incapacity is not sufficient . . . but that 'total' incapacity is also unnecessary. The choice of the word 'appreciate' rather than 'know' . . . also is significant; mere intellectual awareness that conduct is wrongful, when divorced from appreciation or understanding of the moral or legal import of behavior, can have little significance. . . . Expert testimony . . . will be admissible whenever relevant but always *as* expert testimony — and not as moral or legal pronouncement. Relieved of their burden of divining precise causal relationships, the judge or jury can concentrate upon the ultimate decisions which are properly theirs, fully informed as to the facts."

[6] There is an especial need in murder cases (and most insanity trials are in such cases) for permitting psychiatrists to state the extent of the impairment of capacity apart from an opinion whether it had reached the point of legal insanity (criminal irresponsibility within the definition). This stems from our statute which allows the jury to recommend against the death penalty. G. L. c. 265, § 2. In *State* v. *Lucas*, 30 N. J. 37, 87, Weintraub, C.J., in a concurring opinion said, "I have no doubt that . . . [full psychiatric] testimony belongs in the case for that purpose. I am convinced the Legislature so intended when . . . it provided that the jury shall fix the punishment. . . . The mental condition of a man is so inseparable from the issue of a just disposition — just to him and to society — that it is inconceivable that the Legislature intended to exclude it."

Commonwealth *v.* McHoul.

admitted in general conformity with the foregoing, *Commonwealth* v. *McCann,* 325 Mass. 510, 514–515; *Commonwealth* v. *Lundin,* 326 Mass. 551, 556–558; *Commonwealth* v. *Chapin,* 333 Mass. 610, 619–627; *Commonwealth* v. *Chester,* 337 Mass. 702, 707–710; *Commonwealth* v. *Harrison, supra.*[7]

The Code's expression of the dual test modifies the classical *Rogers* case wording in three significant respects: (1) the qualification of "capacity" ("substantial capacity"); (2) the use of the word "appreciate" rather than "know"; and (3) the rejection of the words "irresistible impulse" in stating lack of capacity to control conduct.

We think our test *as applied* has been in all likelihood, in most cases, a "substantial capacity" test. The rule, significantly, has been the criterion applied in the uncertain case. Its main function has not been to say that the idiot or similarly mindless person shall not be convicted; prosecutors do not bring such persons to trial. See G. L. c. 123, §§ 99, 100, 100A. A defendant's sanity comes to trial in cases where psychiatrists can and do hold and state opposing views. All such cases show that psychiatry is far from an exact science and that whether a defendant is to be called sane or insane cannot depend on any certain measurement.

---

[7] In this case also, in general, the psychiatrists were permitted to state their views in terms of modern psychiatric concepts. Dr. Robey, the clinical director of the Bridgewater State Hospital for the Criminally Insane, called by the defendant, had seen McHoul ten to fifteen or more times. On March 29, 1966, the defendant was mentally ill; he had also a brain disease and mental deficiency "making a fairly serious problem psychiatrically." He was mentally ill within the definition of G. L. c. 123, § 1. Dr. Robey would expect the brain damage he had referred to would cause a defect in the defendant's judgment or his ability to control his behavior. The defendant was diagnosed to have a schizophrenic reaction, one of the more serious of the mental illnesses. It affects the patient's ability to test reality, to understand and recognize what is real and what is not real. The defendant had shown overt paranoid signs, and depression "to the point of even being suicidal," and at "one point he showed . . . catatonic signs." The symptoms would come and go. On cross-examination, Dr. Robey testified that, when he discharged the defendant as competent to stand trial, he was aware the defendant could be sexually dangerous. The record facts in respect of a prior commitment included two charges of breaking and entering with intent to commit rape. On March 29, 1966, the defendant "knew in the intellectual sense the difference between right and wrong" and was aware of the nature and the quality of his actions. Q. "And even though you may say that his actions were impulsive . . . you cannot consider them as irresistibly so, can you?" A. "Yes, I could, but this is an opinion I cannot — [answer unfinished]." As to irresistibleness of the defendant's action on March 29, 1966, Dr. Robey was of "the opinion that he could have been irresistibly impelled." "I cannot say clearly." "I am giving an educated opinion."

Chief Judge Murrah, in *Wion* v. *United States,* 325 F. 2d 420, 427–428 (10th Cir.), quoting Frankfurter, J., in *Leland* v. *Oregon,* 343 U. S. 790, 803, has observed, "Only one proposition seems certain, i.e. that '. . . [s]anity and insanity are concepts of incertitude.' " In any but the extreme case, where there will be no controversy, no expert can speak with scientific certainty and no jury can or does act on the assumption that some of the experts in the case have done so. See *Commonwealth* v. *Hartford,* 346 Mass. 482, 489–490.

The Code intends that "a defendant will not be convicted of crime if mental illness has deprived him of effective power to make the right choices in governing his own behavior." Schwartz, The Model Penal Code, 49 Am. Bar Assn. J. 447, 449. According to the *Freeman* opinion, *supra,* the Code "will remove from the pale of criminal sanctions precisely those who are in no meaningful sense responsible for their actions" (357 F. 2d at 623). Such is the precise intent of our test, expressed in terms of capacity. This, we believe, is what juries have understood they should determine when so instructed.

We turn to the other changes in the language of the definition. We think that the use of "appreciate" rather than "know" expresses what the word "know" in the classical statement of the rule means in the light of modern knowledge. Many psychiatrists, as indicated in the records in recent cases, appear to have recognized this.

"The draft . . . accepts the criticism of the 'irresistible impulse' formulation as inept in so far as it may be impliedly restricted to sudden, spontaneous acts as distinguished from insane propulsions that are accompanied by brooding or reflection. See e.g., Royal Commission on Capital Punishment, Report (1953) par. 314, p. 110." — Comment (3) to § 4.01 of Model Penal Code, Tent. Draft No. 4 (1955), p. 157. This is an important change in respect of that part of the dual test under which the chief controversy arises in many if not most cases, including the case at bar (fn. 7). See *United States* v. *Currens,* 290 F. 2d

751, 775 (3d Cir.). The new wording, we believe, will tend to minimize misunderstanding and is plainly advantageous. We think that, for some time, many expert witnesses have testified more nearly in accordance with the new definition. Although the issue has been, as Chief Justice Shaw in substance stated, whether the defendant was irresistibly impelled to the act done, the emphasis, in modern times, has inevitably been on the concept expressed in the word "irresistible."

We think that the statement of Chief Justice Shaw that if there is an irresistible impulse the deed is "not the act of a voluntary agent, but the involuntary act of the body, without the concurrence of a mind directing it," no longer reflects the general understanding of how human beings act. Although the mind may have a part in planning and executing compulsive acts, that circumstance does not prevent the finding of "irresistible impulse." This 1844 statement is, of course, not an integral part of the rule and its omission in the Code reformulation does not show essential variance.

Our view that the Code restates our rule appears to be that of the Tenth Circuit. In *Wion* v. *United States,* 325 F. 2d 420, 424, 430, the charge that was questioned had been phrased in one of the several established variations of the *Rogers* case statement. The court expressly rejected the *Currens* rule (and by implication the *Durham* rule) and approved the Code definition. It concluded that there was no error in the instruction, because the definition of insanity as stated "embodied . . . all of the elements of the A.L.I. Code." See also *Dusky* v. *United States,* 295 F. 2d 743, 759 (8th Cir.), cert. den. 368 U. S. 998.[8]

---

[8] In the *Dusky* case, the court went beyond our view saying, " [W]e would hesitate to reverse a case . . . *if* the charge appropriately embraces and requires positive findings as to 3 necessary elements, namely, the defendant's *cognition,* his *volition,* and his *capacity to control* his behavior. . . . We think this approach to be sound because it preserves and builds upon those elements of M'Naghten and of irresistible impulse which are acceptable in these days and yet modernizes them in terms which a jury can grasp and apply." *Feguer* v. *United States,* 302 F. 2d 214, 244–245 (8th Cir.), cert. den. 371 U. S. 872; *Pope* v. *United States,* 372 F. 2d 710, 736 (8th Cir.).

The Code definition does not bar such questions as whether the defendant is legally sane. See *Commonwealth v. Chapin,* 333 Mass. 610, 625. Nor is there an implication that such questions should be barred.[9] But the new language means, we believe, a lessening in semantic dueling between attorneys and experts, and an end to the confusing debates on the issue: "Does he know right from wrong?" and related topics.[10] See, for example, *Commonwealth v. Chapin,* 333 Mass. 610, 621–622. With the definition of legal insanity expressed as lack of "substantial capacity . . . to appreciate . . . or to conform," the examination and cross-examination should be in terms in which the psychiatrist feels that his expertness and training enable him to speak and support him in testifying. We anticipate, nevertheless, about the same division of experts at future trials of the issue of criminal irresponsibility.[11]

In both New Jersey (*State v. Lucas,* 30 N. J. 37, 63–72) and Washington (*State v. White,* 60 Wash. 2d 551, 578–593), where the Code definition has been rejected, the issue was whether to replace the M'Naghten test. The opinions lay stress on the wisdom of a policy of punishment for its general and specific deterrent effects. As these opinions reject the defence of irresistible impulse, they necessar-

---

[9] See Model Penal Code, Proposed Official Draft (1962) § 4.07 (4) ". . . Form of Expert Testimony When Issue [of Responsibility] is Tried." That section is, of course, not in any way involved in our approval of § 4.01.

[10] See *United States v. Currens,* 290 F. 2d 751, 772 (3d Cir.). "The way must be cleared . . . for the psychiatrist to explain the condition of the defendant . . . in understandable terms. . . . [He] should not be asked . . . 'Did the defendant . . . know the difference between right and wrong?' . . . Such questions, put in the course of a trial, are so vague as to be meaningless"; Glueck, Mental Disorder and the Criminal Law, p. 309, fn. 2. "The most fruitful source of error and confusion in this field of law is traceable to the requirement that the expert say categorically whether . . . [the defendant] did or did not know right from wrong." See also Model Penal Code, Tent. Draft No. 4 (1955) § 4.01, Appendix B, 178–179; Appendix C, p. 191.

[11] The usual dilemma is whether in the particular case the impulse was irresistible. No expert can answer, with scientific or medical certainty, whether it was impulse not resisted or impulse irresistible. That is the basis of thoughtful criticism of the dual test as distinguished from the M'Naghten rule. See 37 Col. L. Rev. 701, 757. This dilemma remains under the "substantial capacity" test. Experts, if asked whether there was "substantial capacity," may therefore be expected to differ in their answers.

ily reject the Code definition and they do not bear on whether the Code is a satisfactory restatement for those jurisdictions already committed to the irresistible impulse principle.[12]

It is appropriate to observe, however, that, in our view, the Code restatement does not suggest a weakening in respect of deterrence. See the *Wion* case, *supra* (325 F. 2d 420, 426–430). The principle of criminal irresponsibility, embodied in the *Rogers* rule and in the Code is to maintain the general and specific deterrent effect of criminal penalties for wrong conduct, subject only to recognition of the injustice of punishing those lacking the capacity to appreciate the wrongfulness of, or to control, their behavior. See Wechsler, The Criteria of Criminal Responsibility, 22 Chicago L. Rev. 367, 372, 374.

It follows from what we have said that, although the trial of this case under the *Rogers* rule would have given no basis for claim of error, nevertheless, in cases hereafter tried, the trial is to be conducted and the charge given under the clearer and more understandable words of § 4.01 of the Model Penal Code.

3. We deem it unnecessary to discuss the other exceptions.

*Judgments reversed.*
*Verdicts set aside.*

---

[12] *State* v. *Poulson,* 14 Utah 2d 213, 216, reaffirming an established wording of the dual test, has rejected the Code definition without discussion.