COMMONWEALTH vs. RONALD J. DeWOLFE.

Plymouth. January 5, 1983. — May 6, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, & LYNCH, JJ.

*Evidence,* Relevancy and materiality, Hearsay. *Insanity. Practice, Criminal,* Request for fees and costs.

At a criminal trial in which the defendant attempted to establish the defense of insanity, the judge did not err in excluding evidence that the defendant had earlier been found incompetent to stand trial. [123]

At a criminal trial in which the defendant attempted to establish the defense of insanity, admission of certain hearsay statements in the testimony of two psychiatrists did not, in the circumstances, present a substantial risk of a miscarriage of justice. [123-124]

In a criminal case in which two motions filed by the indigent defendant for special fees seeking the appointment of a particular psychiatrist for an independent psychiatric examination had been allowed, the judge considering the defendant's third motion for fees did not abuse his discretion in limiting use of the fees to payment to the psychiatrist previously selected by the defendant. [125-126]

INDICTMENTS found and returned in the Superior Court on June 28, 1978.

A motion for special fees was heard by *Ford, J.,* and the cases were tried before *Donahue, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Jack M. Atwood* for the defendant.

*John P. Corbett,* Assistant District Attorney, for the Commonwealth.

LIACOS, J. On June 28, 1978, the defendant was indicted for unlawful sexual intercourse with a child and assault and battery by means of a dangerous weapon. The defendant submitted to a psychiatric examination, see G. L. c. 123, § 15, and was committed to the Bridgewater State Hospital.

On February 6, 1979, after a hearing, a judge of the Superior Court found the defendant incompetent to stand trial and ordered the defendant committed for an additional forty days of observation. On August 1, 1979, after a hearing, a different judge of the Superior Court found the defendant competent to stand trial.[1] The defendant was tried on both indictments and was convicted by a jury on December 3, 1979. He was sentenced to a term of life imprisonment for unlawful intercourse with a child and to a concurrent term of four to five years for assault by means of a dangerous weapon. The defendant filed a timely notice of appeal. We transferred the appeal here on our own motion.

The defendant claims that the trial judge erred in excluding testimony concerning his competency to stand trial, in allowing in evidence certain hearsay statements, and in marking for identification as evidence certain legal materials found in the defendant's cell. He also claims that a motion judge of the Superior Court abused his discretion when he approved the defendant's request for special fees for an additional psychiatric examination but specified that the funds could be used only to pay for an examination conducted by a doctor previously selected by the defendant. We have reviewed the defendant's arguments and the record, and we now affirm.

The facts shown by the evidence are these. On June 24, 1978, the victim and a girl friend performed a variety of household chores for the defendant. They left his apartment during the late afternoon. The victim's friend lived next door to the defendant. Early that evening, the defendant telephoned the victim, a thirteen year old female, and asked her to return to his apartment to do some additional chores. The victim went to the defendant's apartment. The defendant opened the door, let her in, and then pretended to talk with his wife, who was supposedly indisposed in the bathroom. At the defendant's request, the victim performed

---

[1] The trial judge also found the defendant competent to stand trial.

several household chores. As she was about to leave, the defendant asked her to take some rubbish out of a bedroom closet. The defendant followed the victim into the bedroom and then pushed her on the bed. Brandishing a knife, he threatened to kill her and forced her to undress. He then took her to the bathroom to show her that his wife was not present. The defendant led the victim back to the bedroom and raped her.

After the rape, the defendant brought the victim into the kitchen and expressed remorse for his deed. He told her that he would call the police. He began to dial a telephone number. Realizing that the defendant was not dialing the number for the police, the victim fled and went to her friend's house next door. She complained that she had been raped by the defendant. Her father was called, and he arrived several minutes later. The police arrived soon thereafter. The victim gave them an account of the incident. She was taken to a hospital. A medical examination was conducted, and mobile sperm was found in her vagina.

The police went immediately to the defendant's apartment. Receiving no response to their knocks on the door, they broke into his apartment and found a note on the kitchen table which read, "Gone to New Bedford at 9:02 p.m. Wait for me, please. Love, Ron." A search of the apartment revealed the defendant under a bed with his eyes closed and his body "stiff as a board." Repeated attempts to rouse him failed. He was carried out of the apartment and taken to a hospital. The police also discovered the knife used by the defendant.

At trial, the defendant attempted to establish a defense of insanity. He testified that he had no memory of the incident. He claimed only to remember being in his apartment that day and being at a hospital that evening. He testified also that he had never seen the victim prior to the trial, and that he had not raped her. He also testified that he is subject to "blackouts" and hears voices telling him that they want to kill him.

Two psychiatrists, Dr. Moore and Dr. Dietz, testified. Both testified that the defendant was mentally disturbed and that he displayed symptoms of a paranoid schizophrenic; but they also agreed that he exaggerated the extent of those symptoms. They both stated that, in their opinion, the defendant was criminally responsible for his acts on June 24, 1978.

1. The defendant's first claim of error is that the trial judge excluded testimony indicating that the defendant previously had been found incompetent to stand trial. Insanity after the crime and at the time of trial may be relevant to the material fact of insanity at the time of the crime. *Commonwealth* v. *Harrison*, 342 Mass. 279, 286-287 (1961). But the legal standards for determining whether a defendant was criminally responsible for his acts at the time of the crime and whether he is competent to stand trial are distinct. Compare *Commonwealth* v. *Hill*, 375 Mass. 50, 52, 54 (1978) (competence to stand trial), with *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-548, 555 (1967) (criminal responsibility). See generally *Commonwealth* v. *Kostka*, 370 Mass. 516 (1976). The admission of the prior finding of incompetence to stand trial could have been a potent source of confusion for the jury. The judge permitted the psychiatrists to testify as to the defendant's mental state during the period between the crime and the trial. He committed no error by excluding the earlier finding of incompetence to stand trial.

2. The defendant's second claim of error is that certain hearsay statements were improperly admitted in evidence. The defendant, however, did not make proper and timely objections to the admission of this testimony and therefore has not preserved, as matter of right, these matters for appellate review. There was no objection to Dr. Dietz's testimony that the defendant had been described by "people on the unit" as being "coherent." The defendant did not object to Dr. Dietz's testimony that he had been told that certain legal materials concerning the insanity defense had been discovered in the defendant's possession. The trial

judge then admitted the testimony with the understanding that the Commonwealth would produce, as a witness, the person who found the materials.[2] When the Commonwealth failed to produce that witness, the defendant did not make a motion to strike and therefore did not preserve fully his rights. See *Commonwealth* v. *Furtick,* 386 Mass. 477, 481-483 (1982). Finally, the objection made when Dr. Dietz testified that he had been told that the defendant had engaged in discussions with other individuals at Bridgewater State Hospital concerning competence to stand trial and criminal responsibility was directed to Dr. Dietz's reference to the discovery of legal materials in the defendant's possession. This objection did not relate to the hearsay issue which the defendant seeks to raise here. We review the defendant's claims, therefore, only to determine if there is a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967).

On reviewing the record, we perceive no such risk. Both Dr. Dietz and Dr. Moore testified that they believed that the defendant was exaggerating his symptoms. Dr. Dietz testified that the hearsay statements simply confirmed his opinion, which was based primarily on his clinical observation. Both doctors also testified that, under the standard of *Commonwealth* v. *McHoul, supra,* the defendant was criminally responsible on the date of the crime. Dr. Dietz did not find evidence that the mental disorder from which the defendant suffered was of such severity as to impair his capacity to conform his conduct to the requirements of the law or to appreciate the wrongfulness of his conduct. There is no basis for reversing the judgment.[3]

---

[2] The defendant's argument that it was error to mark a photocopy of these materials "for identification" is frivolous. The document was not admitted as evidence, nor was it exhibited to the jury.

[3] We would reach the same result even if we were to conclude that the defendant properly preserved his rights. We agree that, while an expert may give the reasons for his opinion, he may not put in evidence incompe-

3. The defendant's third claim of error is that the motion judge erred by requiring that special fees awarded under G. L. c. 261, § 27C (4), be used only for examination by Dr. Moore.[4] We disagree.

The defendant, who had been determined to be indigent, filed two motions for special fees seeking the appointment of Dr. Moore to undertake an independent psychiatric examination. Both motions, which were filed on December 20, 1978, and May 21, 1979, respectively, were allowed, and Dr. Moore examined the defendant several times. On October 9, 1979, the defendant's original counsel was permitted to withdraw from the case, and his present counsel was appointed. On October 26, 1979, a hearing was held to determine whether the defendant's third motion for fees should be allowed. The defendant's present counsel stated that the examination was necessary to investigate the defendant's "blackout question" which Dr. Moore had never had an opportunity to consider. He also made oral representations from which it might have been inferred that the defendant's prior counsel had indicated that Dr. Moore might be biased against the defendant. The judge allowed the motion but limited use of the fees to paying Dr. Moore. The parties also set a trial date of November 13, 1979.

We do not think that the judge abused his discretion. We agree with the defendant that the potential value of medical

_____

tent matters. *Commonwealth* v. *DeSalvo*, 353 Mass. 476, 482 (1968). We view the testimony as to the hearsay reports, however, to be merely cumulative and its admission to be harmless error.

[4] General Laws c. 261, § 27C (4), as appearing in St. 1980, c. 539, § 7, provides, in part: "If the court makes a finding of indigency, it shall not deny any request with respect to normal fees and costs, and it shall not deny any request with respect to extra fees and costs if it finds the document, service or object is reasonably necessary to assure the applicant as effective a prosecution, defense or appeal as he would have if he were financially able to pay." General Laws c. 261, § 27D, provides an avenue for interlocutory appeal. We have not decided yet whether that avenue is exclusive. *Commonwealth* v. *Bolduc*, 383 Mass. 744, 748-749 (1981). *Commonwealth* v. *Lockley*, 381 Mass. 156, 159-160 (1980). Since the defendant was not informed of his right to appeal under § 27D, we need not decide the question. See *Commonwealth* v. *Lockley, supra.*

testimony as to the defendant's mental capacity was sufficiently important to warrant the award of special fees. See *Commonwealth* v. *Lockley*, 381 Mass. 156, 160 (1980). We also agree that a defendant ordinarily should be allowed to select his own doctor to examine him, although we do not consider such a choice to be a matter of right. See *United States* v. *Lincoln*, 542 F.2d 746, 750 (8th Cir. 1976), cert. denied, 429 U.S. 1106 (1977); *United States* v. *McNally*, 485 F.2d 398, 406 (8th Cir. 1973), cert. denied, 415 U.S. 978 (1974). In the instant case, as a result of the defendant's original motions, fees were awarded, and the defendant was permitted to select his own doctor.

In these circumstances, the judge considering the third motion did not abuse his discretion by limiting the use of the fees for payment to the doctor previously selected by the defendant. The defendant had an opportunity, by virtue of the hearing, to introduce evidence which might have demonstrated the need for a new doctor, see *Commonwealth* v. *Lockley, supra* at 161, but did not do so. An oral representation made to the motion judge is an insufficient basis for this court to upset the exercise of discretion below.

Several other points are worth mentioning briefly. The fact that Dr. Moore did not find the defendant to be legally insane does not create the right to have a second pyschiatrist appointed to examine him. Cf. *United States* v. *Valtierra*, 467 F.2d 125, 126 (9th Cir. 1972). The purpose of the additional examination was to examine the question of the defendant's blackouts. A new doctor who did not have the benefit of prior observations would have been handicapped in evaluating the significance, if any, of the "blackouts." Further, the examination would have occurred more than a year after the date of the crime. The probative value of the opinion of a second doctor, who would have had no prior contact with the defendant, as to the defendant's mental capacity at the time of the crime, would not have been as strong as the opinion of an expert who had the opportunity to examine the defendant at a time closer to the date of the crime. Finally, the motion judge could have given some

weight to the fact that the parties had settled on a trial date, and the possibility that an examination by a new doctor might have resulted in delay.

*Judgments affirmed.*